Edward B. THOMPSON and Darrel D. Fowler, for and in behalf of all others similarly situated, Plaintiffs,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Northwest Airlines, Inc., and Air Line Pilots Association, International, Defendants.

Civ. A. No. 91–3291 (MTB).

United States District Court,
D. New Jersey.

June 23, 1992.

Janice Goodman, New York City, for plaintiffs.

Paul, Hastings, Janofsky & Walker, Washington, D.C. by John Gallagher, for defendant Northwest Airlines.

Proskauer Rose Goetz & Mendelsohn, Clifton, N.J. by Kathleen McKenna, for defendant Prudential Ins.

Cohen, Weiss & Simon, New York City by Peter Herman, for defendant ALPA.

## OPINION

BARRY, District Judge.

### I. INTRODUCTION

This litigation involves two former airline pilots who, after reaching the age of 60, sought both to continue to work as second officers and to receive retirement benefits to which they believed they were entitled. After being informed that they could not receive such benefits until they had, in fact, retired, Edward Thompson and Darrel Fowler ("plaintiffs") filed a complaint against their employer, Northwest Airlines, Inc. ("Northwest"); the insurance company responsible for paying the benefits, The Prudential Insurance Company of America ("Prudential"); and the pilots' union, the Air Line Pilots Association International ("ALPA"). The complaint alleges that the refusal to pay plaintiffs what they believe they are owed—and when—is either a breach of contract under Minnesota law (Count I)[1] or, if applicable, a violation of the Employee Retirement Income Security

---

1. The parties agree that Minnesota law is applicable to the present case.

Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") (Count II). A violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (Count III) is alleged as well.

Presently before the Court are the various motions and cross-motions of the parties.[2] For the reasons which follow, plaintiffs' motion for partial summary judgment will be denied, and the motions for summary judgment by Prudential and Northwest will be granted.

## II. FACTS

Plaintiffs were employed as pilots by Republic Airlines, Inc., ("Republic") which was merged into Northwest in 1986. Upon reaching the age of 60, plaintiffs, by virtue of Federal Aviation Administration regulations, were prohibited from continuing as pilots or first officers (co-pilots) on commercial aircraft. *See* 14 C.F.R. § 121.-383(c) (1991). They therefore advised Northwest that although they could no longer remain employed as pilots, they wished to "bid down" to another position and continue to work for Northwest as second officers (flight engineers). (Thompson Aff., ¶ 5; Carlson Aff., ¶ 3) Plaintiffs claim to have expected that they would begin receiving their retirement benefits at this juncture, regardless of whether they remained in Northwest's employ.

The annuity plan under which plaintiffs claim immediate entitlement to payment is the direct result of the decision to terminate an earlier benefits plan. Initially, plaintiffs were participants in the Republic Pilots Retirement Income Plan ("Republic Plan"), which provided in Section 5.8 for the non-payment of benefits in the event of continued employment beyond the usual retirement age of 60. However, in 1984 Republic and ALPA decided to terminate the Republic Plan and annuitize the accrued benefits thereunder. Prudential became the annuity provider with Republic paying Prudential the appropriate premiums until

June 28, 1985. Thereafter, on June 29, 1985, Republic gave notice of its intent to terminate the Republic Plan and did so effective July 31, 1985.

There were continuing negotiations through 1986 between Republic, Prudential, ALPA and, subsequently, Northwest, the successor to Republic. A formal group annuity contract, GA–4921 ("GA–4921"), which funded the benefits under the by then defunct Republic Plan, was executed by Northwest on December 29, 1986 and by Prudential on February 26, 1987. In January, 1987, individual annuity certificates pertaining to GA–4921 were issued by Prudential to the participants of the Republic Plan. Plaintiffs received their annuity certificates from Northwest, although they did not receive a copy of the contract. (Thompson Aff., ¶ 2; Fowler Aff., ¶ 2; 2d Thompson Aff., ¶ 24) The letter written to each participant pointed out that the enclosed annuity certificate was subject to the terms of the contract and plan. (Thompson Aff. Exh. 1).

The certificate provides that: "Your annuity may be suspended if the Contract-Holder [Northwest] notifies Prudential that the Plan provides for it." (Thompson Aff. Exh. 1) It provides further that "The contract tells what Prudential is obliged to do regarding you and your benefits.... Prudential guarantees to make the payments described in this Certificate under the terms of the Plan and the Contract." (Id.)

Although the annuity contract—GA–4921—states that the "first monthly payment of any Life form of Annuity is payable to an annuitant on his Annuity Commencement Date if he is then living," it also specifically provides for an exception to this rule, namely, where an employee continues his or her employment. Section 2.10 of GA–4921 states:

*Suspension of Annuity Payments (other than for Disability):*
The Plan provides that under certain circumstances payments that would other-

---

**2.** Although not a movant in its own right, defendant ALPA has responded to plaintiffs' claims which pertain directly to its conduct, denominating them as "unfounded" and "irrelevant".

At oral argument on the pending motions, counsel for plaintiffs represented that no relief is being sought against ALPA.

wise be made to an annuitant will not be made. Two of such circumstances would arise from a reemployment by Republic Airlines, Inc. or a successor or *from a continuation of employment with Republic Airlines, Inc. or a successor after attaining age 60.* If the Contract Holder notifies the Prudential that payments to the annuitants are to be suspended or postponed in accordance with the Plan, payment of the annuity to the annuitant will be so suspended or postponed.

(GA–4921, addendum to Pl. Notice of Motion) (emphasis added).

Over the years, the various Republic plans and the amendments thereto have consistently provided that employees were entitled to benefits only upon retirement. The 1980 Republic Plan, for example, provided that:

> The Termination of Employment of a Participant at or after his normal Retirement Date [defined as the last day of the month in which the Participant attains age 60] for any reason other than his death shall be deemed to be a retirement. Upon such retirement he shall be entitled to a pension payable monthly for life, the first payment to be made as of the first day of the month next following his Termination of Employment ... The monthly amount of the pension shall be equal to his Accrued Monthly Pension.

(Id. at § 5.2). The 1985 amendments to the Republic Plan remained consistent on this point. *See* 6/30/85 Republic Plan §§ 5.2(b), (e), 5.8 and 5.13; Merow Aff. ¶ 5 & Exh. E.[3]

**3.** Although, given the above, the contention is irrelevant, plaintiffs contend that an amendment to the Republic Plan dated June 28, 1985, which incorporated the suspension of benefits to annuitants who continue to work beyond age 60, was improperly adopted and, thus, not an effective amendment to the Republic Plan. This argument is based on the fact that the amendment, which purports to be retroactive to January 1, 1984, was adopted on June 28, 1985, after the expiration of the time period within which to adopt an amendment with retroactive effect, i.e. no later than two and one half months after the close of the Plan year. The Republic Plan year ended December 31, 1984. (Pl. 12G, ¶ 1).

In the fall of 1989, plaintiffs informed Northwest that they were about to reach age 60 and wished to continue in Northwest's employ as second officers. Plaintiffs also informed Northwest that they anticipated receiving their annuity benefits under the annuity contract as of their normal retirement date, *i.e.* age 60. *See* Carlson Aff. ¶ 3; Pl. Exh. 2–4). To date, plaintiffs have not received the benefits they seek because, although they have passed age 60, they remain in Northwest's employ.

## III. DISCUSSION

As noted earlier, the complaint alleges a violation of ERISA if GA–4921 constitutes an ERISA plan, or a breach of contract under Minnesota law if it does not. It alleges, as well, a violation of the ADEA. Prudential and Northwest have moved for summary judgment as to each count of the complaint and plaintiffs have moved for partial summary judgment on their contract claim.

### A. *ERISA Claim and OBRA*

■ Preliminarily, the parties disagree as to whether, following the approved termination of the Republic Plan under Title IV of ERISA, there would remain Title I ERISA obligations pertaining to that plan. This court need not resolve this dispute, however, because GA–4921 does not constitute an ERISA plan under 29 C.F.R. § 2510.3–3(b) (1991) and (d)(2)(ii), the regulations which the parties agree control whether the annuity plan constitutes an ERISA plan. *See* Pl. Br., at 47.[4]

**4.** Plaintiffs suggest that termination under Title IV does not amount to an automatic cessation of Title I obligations (which govern the "establishment, operation, and administration" of employee benefits plans) because Title I and IV are independently administered sections of ERISA—Title IV being administered by the Pension Benefit Guaranty Corporation and Title I being administered by the Department of Labor. Prudential argues that as a matter of common sense a plan that has been validly terminated under ERISA is no longer governed thereunder. It should be noted that this argument has been passed on in another matter by the Department of Labor. DOL Advisory Opinion 81–60A states:

Title I is inapplicable to "any plan, fund or program ... under which no employees are participants covered under the plan." 29 C.F.R. § 2510.3–3(b). An employee "is not a participant covered under an employee pension plan ... if—

(A) the entire benefit rights of the individual—

(1) are fully guaranteed by an insurance company ... and are legally enforceable by the sole choice of the individual against the insurance company ...; and

(2) a contract, policy or certificate describing the benefits to which the individual is entitled under the plan has been issued to the individual.

29 C.F.R. § 2510.3–3(d)(2)(ii).

Plaintiffs contend that GA–4921 constitutes an ERISA plan because the suspension provision in the agreement "may mean that plaintiffs' 'entire benefits rights' are not guaranteed under GA–4921 and are not legally enforceable by plaintiffs' 'sole choice.'" (Pl. Br. in Support, at 7) Furthermore, because § 2.10 states that Northwest must give notice to Prudential in order to suspend payments, plaintiffs argue that this leaves Northwest with "residual discretionary authority" such that the benefits are not fully guaranteed by the insurance company, nor is legal recourse solely against the insurance company. This contention fails for two reasons. First, the Republic Plan specifically provides for the plan sponsor to suspend benefits if the participant continues to be employed beyond age 60, and, thus, GA–4921 continues the benefit obligations "in the form that would be paid under the plan upon retirement." *See* 29 C.F.R. § 2617.[5] This is so regardless of whether the suspension pro-

vision can properly be given retroactive effect because the plan has consistently provided for the payment of benefits "upon retirement."[6]

Plaintiffs' contention also fails because a suspension of benefits is consistent with a full "guarantee" by an insurance company with plaintiffs able to legally enforce that guarantee at their "sole choice." What is guaranteed is an individual's "entire benefit rights" and these rights include "the participant's nonforfeitable benefits under the plan." 29 C.F.R. § 2618.15. A "nonforfeitable benefit" is a "benefit for which the participant has satisfied the conditions for entitlement under the plan ... whether or not the benefit may subsequently be ... suspended by ... an occurrence of any condition." 29 U.S.C. § 1301(a)(8).

Nothing in the relevant regulations requires there to be a direct relationship between the annuitant and the insurance company, nor do they even mention "residual discretionary authority." All that is required is that plaintiffs, at their sole discretion, have legal recourse against Prudential if it fails to make annuity payments under the terms of GA–4921. Plaintiffs have not cited any authority in support of their "discretionary authority" argument, and, indeed, if plaintiffs are correct, virtually every annuity purchased in terminating an ERISA plan would remain an ERISA plan due to the continuing information demands that an insurer makes of the former sponsor of the terminated plan.

Even assuming that Northwest is *prohibited from retaining* "residual discretionary authority," plaintiffs' argument is still wanting because Northwest does not retain any such authority which affects

In your letter you advance the argument that the Plan is not covered by Title I of ERISA because the Plan ... has been terminated and all assets distributed therefrom. We do not agree that merely because an employee pension benefit plan has not provided for post-ERISA contributions, the plan would not be subject to Title I ... Nor do we agree with your alternative argument if the conditions of regulation section 2510.3–3(d)(2)(ii), noted above, are not met.

*See* Goodman Aff. Exh. H. *See also* DOL Adv. Op. 84–01A (Jan. 4, 1984); Pension and Welfare

Benefits Administration Advance Notice of Proposed Rulemaking, 56 Fed.Reg. 28,638 (June 21, 1991).

5. Parenthetically, this type of provision is authorized by law. *See* 29 U.S.C. § 1053(a)(3)(B).

6. Plaintiffs' argument that the amendment suspending benefits was improperly adopted only has merit if the amendment decreased an accrued benefit. ERISA § 1054(g)(1). It did not.

plaintiffs' benefits guarantee or their ability to have legal recourse against Prudential. Simply because Northwest may have the right to waive the suspension of benefits by failing to notify Prudential when an employee does not retire—a waiver which Northwest apparently has never chosen to exercise—does not mean that Prudential has failed to guarantee the annuity benefits or that Prudential cannot be sued to collect thereupon.

Thus, it is clear that GA–4921 satisfies all of Republic's obligations vis-a-vis the termination of the Republic Plan and does not constitute an employee benefit plan within the meaning of 29 C.F.R. § 2510.3–3(b). Because plaintiffs' ERISA claim depends upon the existence of a plan governed by that statute, Prudential and Northwest's motion for summary judgment on plaintiffs' ERISA claim will be granted. Concomitantly, that motion will be granted as to plaintiffs' OBRA claim as well.[7]

## B. *Breach of Contract*

Thus, aside from the ADEA claim, to be discussed *infra*, plaintiffs' cause of action, if any, lies in breach of contract. In their motion for partial summary judgment, plaintiffs argue that they are entitled to payment of the benefits they are seeking—and entitled to payment now—because Northwest failed to properly notify Prudential, in accordance with § 2.10 of GA–4921, that plaintiffs' payments were to be suspended or postponed. Plaintiffs' motion is premised solely on this purported lack of notice.

Prudential has cross-moved for summary judgment on the contract claim, asserting that § 2.10, when read as a whole and in accordance with the parties' intentions, requires plaintiffs to satisfy at least one condition precedent before being entitled to any benefits, *i.e.* plaintiffs must first retire before becoming eligible for benefits. Northwest has also cross-moved for summary judgment, arguing that the contractual duty flows from Prudential, not Northwest, and, assuming the existence of a duty, either notice was given or plaintiffs were not third party beneficiaries entitled to benefit from the notice provision.

### 1. Plaintiffs' Motion for Partial Summary Judgment

■ Plaintiffs argue that under § 2.2 of GA–4921, payments must begin on the "Annuity Commencement Date" (age 60) unless Northwest notifies Prudential that payments to the annuitants are to be suspended, and no such notice was given. Northwest, in response, has submitted the Carlson affidavit in support of its contention that appropriate notice was, in fact, given. In that affidavit, Wesley Carlson, Northwest's Director–Pensions, states that after he was informed that plaintiffs sought to collect their annuity benefits, he contacted his counterpart at Prudential, Jackie Rae, to notify her of plaintiffs' "continued employment past age 60 and to discuss withholding of their annuity payments until their actual retirement ..." (Carlson Aff. ¶ 3) Carlson states that he discussed this matter with Rae on several occasions and the two "continued to agree that annuity payments to Thompson and Fowler should in fact be suspended until their actual retirement...." (Id.)

Plaintiffs take issue with these statements, and point out that if notice had, in fact, been given there would have been no need to have had a series of conversations on the subject. Plaintiffs rely upon the various written communications between Northwest and Prudential as evidence that no notice was given. In particular, plaintiffs rely on a letter by Robert Brodin, the Director of Labor Relations for Northwest, who wrote to plaintiff Fowler in January of 1990 stating that Northwest had written to Prudential about Fowler's requests for benefits, but had not yet received a written

---

7. In Count IIC of the complaint, plaintiffs assert that the annuity contract is subject to portions of the Omnibus Budget Reconciliation Act of 1986 ("OBRA"), Pub.L. 99–509, 100 Stat. 1973. Plaintiffs' OBRA count cannot survive if GA–4921 does not constitute an "employee benefit plan" under ERISA. This is so even though, as discussed below, GA–4921 is an employee benefit plan for ADEA purposes because the OBRA amendments to the ADEA expressly incorporate ERISA's definition of that term. 29 U.S.C. § 623(i)(9)(A).

response. Furthermore, in a letter written in July, 1991 by Raymond Bobrowski, Prudential's Associate Manager for Benefits Services, to Northwest's Labor Counsel Robert Tice, Prudential stated that it suspends benefits only upon receipt of notification from the Plan Administrator. Plaintiffs argue that if notice was given, Prudential would have had no need to remind Northwest of the necessity for notice on plaintiffs' requests.

It is clear that there is a genuine issue of fact as to whether notice was given, at least with respect to plaintiffs' motion for partial summary judgment. Stated somewhat differently, it cannot be said as a matter of undisputed fact that notice was *not* given. Plaintiff's motion must, therefore, be denied.[8]

### 2. Northwest's Motion

■ Northwest's motion for summary judgment addressed to plaintiffs' breach of contract claim will be granted because, as a matter of law, Northwest owes no contractual duty to pay benefits to plaintiffs. Plaintiffs argue that they can hold Northwest accountable for the benefits under GA–4921 because they have standing as third party beneficiaries to that contract. While plaintiffs are, indeed, third party beneficiaries to GA–4921, it does not follow that they may maintain their contract cause of action against Northwest; rather, plaintiffs must look to Prudential for any redress. Even though Northwest may have negotiated GA–4921 and may maintain certain notice and ministerial duties, a third party beneficiary may not recover against a defendant who has not made an express contractual promise to pay. *See Crow & Crow, Inc. v. Saint Paul–Mercury Indemnity Co.*, 247 Minn. 426, 77 N.W.2d 429, 431 (1956). The duty here—that Northwest notify Prudential—is not a duty intended to benefit plaintiffs, but is simply a mechanism whereby Northwest and Prudential communicate for the benefit of each other in properly distributing the annuity benefits. Indeed, in cases commenced by a

third party "contract beneficiary, it is seldom if ever thought necessary that the promisee should be joined as a party." A.L. Corbin, *Corbin on Contracts* § 810 (1952). *See also* 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1613 (1986) ("In cases in which the beneficiary is a party, the courts uniformly reject the argument that all of the original parties to the contract must be joined.").

Northwest's motion for summary judgment on the contract claim will be granted.

### 3. Prudential's Motion

■ Prudential asserts that it is entitled to judgment as a matter of law on plaintiffs' breach of contract claim because plaintiffs have failed to satisfy the condition precedent of retirement before becoming eligible to receive benefits under GA–4921.

In order to establish a cause of action for breach of contract under Minnesota law, a party must prove (1) the formation of a contract; (2) satisfaction of any conditions precedent to the right to demand performance; and (3) failure to perform. *See Briggs Transportation Co. v. Ranzenberger*, 299 Minn. 127, 217 N.W.2d 198 (1974). A condition precedent "calls for the performance of some event or the happening of some event after the contract is entered into and upon the performance or happening of which its obligation is made to depend." *Lake Co. v. Molan*, 269 Minn. 490, 131 N.W.2d 734, 740 (1964). A party does not acquire any contractual rights until the condition occurs. *See National Union Fire Insurance v. Schwing America, Inc.*, 446 N.W.2d 410 (Minn.App.1989).

■ A condition precedent may be either express or implied. In determining whether to imply a condition precedent one should consider the intent of the parties, the general nature of the agreement, and any specific language. *Seman v. First State Bank*, 394 N.W.2d 557, 560 (Minn. App.1986). If there is doubt as to the

---

**8.** Given the discussion and conclusions *infra,* the notice issue and plaintiffs' motion for sum-

mary judgment addressed thereto could well have been denied as moot.

existence of a condition precedent, that doubt should be resolved in favor of implying the condition. *See id.* at 560.[9]

Here, the language at issue is from § 2.10 of GA–4921. Again, that provision states:

> *Suspension of Annuity Payments (other than for Disability):*
> The Plan provides that under certain circumstances payments that would otherwise be made to an annuitant will not be made. Two of such circumstances would arise from a reemployment by Republic Airlines, Inc. or a successor or from a continuation of employment with Republic Airlines, Inc. or a successor after attaining age 60. If the Contract Holder notifies the Prudential that payments to the annuitants are to be suspended or postponed in accordance with the Plan, payment of the annuity to the annuitant will be so suspended or postponed.

Plaintiffs, as the preceding discussion makes clear, read this provision to state that annuity benefits are to automatically commence upon the attainment of age 60 *unless* Prudential is notified to suspend such payments by Northwest. Wholly aside from whether notice was or was not given, this reading ignores the first two sentences of § 2.10.

There can be no doubt that the intent of the parties to GA–4921 (Northwest and Prudential) was to provide for benefits to begin only upon retirement; indeed, Northwest, which was responsible for the suspension provision and whose intent is given great weight, and Prudential agree that this was, in fact, their intent. Not only can plaintiffs not dispute this manifest intent, but their claim of age discrimination rests

on the premise that defendants included the suspension provision in GA–4921 for the purpose of forcing employees to retire at age 60. While the certificate states that the annuity will be paid "if you are living on the Annuity Starting Date," that certificate also provides that GA–4921 "tells what Prudential is obliged to do regarding you and your benefits."

Looking at the general nature of and specific language in GA–4921, the intent of the parties is altogether clear. The first two sentences of § 2.10 specifically state that under certain conditions, including continued employment beyond the age of 60, payments *"will not be made."* (§ 2.10) (emphasis added). This language is not merely prefatory, as plaintiffs suggest; rather, it is mandatory.[10]

Plaintiffs' reliance on the third sentence of § 2.10—that Northwest notify Prudential of a suspension—is unavailing as that sentence does not suggest that retirement is a condition subsequent rather than a condition precedent. When § 2.10 is read as a whole it is clear that the notice to suspend provision is irrelevant for purposes of determining an employee's eligibility; rather, the purpose of the provision is to set forth the procedure Northwest and Prudential must follow vis-a-vis each other in administering the annuity payments and to protect Prudential in the event that payments have already begun and a retired employee decides to return to work. Thus, the sentence following the notice provision states that "[w]hen the annuitant subsequently becomes entitled to payments in accordance with the Plan, the Prudential, will commence payments to the annuitant following notice from the Contract–Holder

---

**9.** Parenthetically, plaintiffs agree that Prudential has properly summarized the state of contract law in Minnesota; they believe, however, that insurance law should apply here. Traditional contract principles, not insurance contract law, are applicable to GA–4921. *See, e.g., Gorr v. Consolidated Foods Corp.,* 253 Minn. 375, 91 N.W.2d 772 (1958). This is particularly true because, as plaintiffs concede, the terms of GA–4921 were negotiated through their collective bargaining representative and, thus, are not solely the language of the insurer. Complaint ¶ 6, 9.

**10.** The language of § 2.2, however, is not necessarily mandatory. Section 2.2 states that "[t]he first monthly payment of any life form of annuity is payable to an annuitant on his Annuity Commencement Date if he is then living." The term "is payable" is not tantamount to "payments must begin" because the Annuity Commencement Date is not the only condition precedent to payment.

of the commencement date and the amount of the payments...." (§ 2.10).[11]

To hold that plaintiffs are eligible for benefits merely because Northwest may have breached a duty owed to Prudential without plaintiffs first having satisfied the condition precedent of retirement would manifest a clearly unintended and, thus, inappropriate result. Prudential's motion for summary judgment insofar as it relates to plaintiffs' breach of contract claim will be granted.

## C. ADEA

■ Plaintiffs allege that Northwest and Prudential violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, discriminating against them by not providing for the payment of benefits at age 60 and the accrual of benefits beyond age 60, although it is clear that plaintiffs *are* accruing benefits as they continue to work under another, but not the defunct, plan.[12] More specifically, plaintiffs allege that the basis for the supposed discrimination is the amendment to § 5.8 of the plan which resulted in "the suspension and permanent withholding of benefits in connection with continued employment beyond age 60", Complaint ¶ 8, and the later inclusion of that provision in GA–4921. *Id.* ¶ 15. Both defendants, in moving for summary judgment, assert that the ADEA action is untimely and fails as a matter of law. Additionally, Prudential claims that it should not be a party to the ADEA claim because it neither is nor was plaintiffs' employer or an agent of Northwest, nor was it named in the ADEA charge.

Plaintiffs have launched what is essentially a two-pronged attack. They allege, first, that nothing which preceded the amendment to the Republic Plan or GA–4921 provided for the "suspension and permanent withholding of benefits" in connection with continued employment after age 60 (Complaint, ¶ 8); and, second, that there is no upward adjustment or increase in benefits beyond age 60 if one continues in Northwest's employ and the annuity payments plaintiffs will receive when they *do* retire will be in the same amount as they would have been had they retired at age 60 (*Id.*, ¶ 14, *but see* note 12, p. 18).

Plaintiffs, in a word, are wrong. None of the plans which preceded the amendment to the Republic Plan or GA–4921 permitted annuity payments to be made to an individual while he or she continued to work past age 60—"double dipping" was never authorized. Moreover, provisions of the various plans aside, there is no evidence that any such person, i.e. over 60 and still employed, ever received annuity payments while employed and ample evidence that no such payments were made. Stated somewhat differently, the amendment to § 5.8 of the plan was nothing new.

Similarly, nothing which preceded the amendment or GA–4921 provided for an upward adjustment or increase in benefits beyond age 60 and one who worked past that age received benefits calculated as of age 60 when he or she eventually retired. Again, nothing new. Thus, plaintiffs' allegations aside, the undisputed evidence reveals that GA–4921 and the amendment to the plan which preceded it operate in the same way as the plan operated since at least as early as 1974: benefits are not paid until one, in fact, retires and the amount of benefits is fixed at age 60. Plaintiffs, it should be noted, do not challenge the earli-

---

**11.** In this situation, one "subsequently" becomes *entitled to payments upon a subsequent retirement.*

**12.** Northwest, but not plaintiffs, have advised the court that aside from the defunct Republic Plan the subject of this suit, plaintiffs currently participate in and are accruing benefits under *two plans not challenged here*—a Retirement Saving Plan, under which Northwest contributes 3 percent of plaintiffs' earnings, and, notably, a Pilots' Retirement Plan under which over–60 pilot employees may accrue benefits for con-

tinued service, including credit for monthly earnings after age 60 that increase "final average monthly earnings" and, thus, raise the monthly pension amount calculated under the plan. (Supp.Mem., Northwest Airlines, at 8–9). In granting defendants' motions for summary judgment, I do not—and need not—rely on these plans although I cannot help but observe that they certainly call into question, if not wholly undercut, plaintiffs' representations concerning what is not being done for employees over the age of 60.

er Republic plans in part, apparently, because they have misread them.

■ But even if the actions that were taken when the amendment was adopted and notice of intent to terminate the plan was given in June 1985 and when GA–4921 was executed shortly thereafter were taken for the purpose of and with the effect of discriminating against plaintiffs and others who continued their employment beyond age 60 (Complaint, ¶ 15), the ADEA claim is untimely, and must fail.

Section 7(d) of the ADEA provides that no civil action may be initiated by an individual unless a charge alleging unlawful discrimination has been filed with the EEOC within 300 days after the alleged unlawful practice occurred. Additionally, a civil action must be commenced within two years of the date on which the cause of action accrues, unless the cause of action arises out of willfulness, in which case a party has three years within which to file suit. 29 U.S.C. § 626(e)(1); 29 U.S.C. § 255(a). Under either scenario, plaintiffs' ADEA claims are time-barred.

Plaintiffs argue, six years after the Republic Plan was terminated and four years after GA–4921 was executed, that the statute of limitations for their ADEA cause of action did not begin to run until they made the decision to remain in Northwest's employ beyond age 60 and after notice to suspend payments pending their ultimate retirement was given. This argument incorrectly assumes that, if there was discrimination, it did not affect plaintiffs until that time and that it was that time that triggered the statute of limitations. In fact, however, the statute of limitations began to run at the time the alleged unlawful suspension provision was adopted and not when it was applied to plaintiffs.[13]

In *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d

961 (1989), the Supreme Court held that the period of limitations for challenging a facially neutral seniority system commences at the time the system is adopted, not at the time the alleged discriminatory system is applied.[14] Quoting *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980), the court stated that "[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful." (emphasis in original).

The petitioners in *Lorance* did not allege that the seniority system at issue there treated similarly situated employees differently or that it was operated in an intentionally discriminatory manner, and plaintiffs do not so allege here. Rather, petitioners claimed that the system's differential impact on the sexes (and, here, the differential impact on employees over 60) had its genesis in discrimination—respondent conspired to *change* the seniority rules to protect incumbent males and the resulting agreement effected a manipulation of seniority rules for that purpose. Petitioners were claiming, in essence, an "intentionally discriminatory *alteration* of their contractual rights." *Lorance, supra,* 490 U.S. at 905, 109 S.Ct. at 2265. Thus, the court concluded, petitioners' claim depended upon proof of the intentionally discriminatory adoption of the system, with the limitations period running from the date of adoption. Indeed, plaintiffs appear to concede that the actions of Northwest in adopting the suspension provision constituted Northwest's alleged discriminatory intent. *See* Complaint ¶¶ 8–9. And while, as noted earlier, the amendment to the plan and GA–4921 did not change what had gone before, the court will assume to the contrary for purposes of this discussion.

---

**13.** Plaintiffs' ADEA claims are time-barred regardless of whether the limitations period began in 1985 when the plan was amended to include the suspension provision or late 1986—early 1987 when GA–4921 was executed. Resolution of the ADEA timeliness issue does not involve any disputed facts.

**14.** Because plaintiffs and others similarly situated are concededly treated the same (Comp. ¶ 15), the Republic Plan and GA–4921 do not come within the *Lorance* court's definition of a "facially discriminatory" system as "one that treats similarly situated employees differently." *Lorance, supra* 490 U.S. at 912, 109 S.Ct. at 2269.

The rationale of *Lorance* is applicable to ADEA cases. In *Lorance,* the Court based its decision on § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), which prohibits a Title VII challenge to the discriminatory effects of a facially neutral seniority system unless the system was adopted with discriminatory intent. The ADEA contains an analogous provision—§ 4(f)(2)—which states that it is not unlawful

> to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the ADEA], except that no such employee benefit plan shall excuse the failure to hire any individual, and no such employee benefit plan shall require or permit the involuntary retirement of any individual ... because of ... age.

29 U.S.C. § 623(f)(2). The Supreme Court has read this section to mean that a benefit plan that varies benefits by age is only unlawful if the employer adopted it with the intent to discriminate against older employees, *i.e.* that the employer adopted it as a "subterfuge." *Public Employees Retirement System v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989).[15]

Plaintiffs attempt to deflect the timeliness issue by arguing that with the passage of the Civil Rights Act of 1991, *Lorance* is no longer good law. Alternatively, plaintiffs contend that even if *Lorance* is applicable, it is limited to those cases in which a complainant with concrete knowledge of a discriminatory act challenges a facially neutral seniority system. Plaintiffs are wrong.

On November 21, 1991, the Civil Rights Act of 1991 was enacted into law, *see* Pub.L. No. 102–166, 105 Stat. 1071 (1991), amending Title VII of the Civil Rights Act of 1964 and section 1981 of the Civil Rights Act of 1866. The Act, however, is on its face not applicable to the claims raised by plaintiffs and, in any event, does not apply retroactively.

> Section 112(2) of the Act provides that an unlawful employment practice occurs, with respect to a seniority system ... when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

Even were this provision on point, it is debatable as to whether it affects ADEA causes of action at all. There is no dispute that § 112, entitled "Expansion of Right to Challenge Discriminatory Seniority Systems," amends only section 706(e) of Title VII. Plaintiffs argue, however, that although § 112 does not specifically amend the ADEA, it would be incongruous and against clear congressional intent if it were not applied to ADEA claims. This argument appears to be the corollary to plaintiffs' argument that *Lorance* only applies to seniority systems in that if one accepts that proposition, and if the Act responds to cases such as *Lorance,* then by implication it also aims to correct those cases which have improperly applied the *Lorance* rationale "outside of the context of seniority systems...." *See* 137 Cong.Rec. S15485 (daily ed. Oct. 30, 1991) (statement of Senator Danforth).

While this argument is not altogether unpersuasive, congressional intent to the contrary is evidenced in the Act itself, which states:

Sec. 107. CLARIFYING PROHIBITION AGAINST IMPERMISSIBLE CONSIDERATION OF RACE, COLOR, RELIGION, SEX OR NATIONAL ORIGIN IN EMPLOYMENT PRACTICES.

Notably, this section makes absolutely no mention of the need to clarify anything which concerns discrimination based on age.[16] Moreover, Congress did, in fact, amend the ADEA in certain sections of the

---

**15.** In 1990 Congress passed the Older Workers Benefit Protection Act, Pub.L. 101–433, 104 Stat. 978–83. This Act overturned the decision in *Betts,* but because Congress specifically provided that it be applied prospectively only, *see* § 105, it has no impact on this case.

**16.** This is consistent with Congress' intent to affect several prior Supreme Court decisions, none of which dealt with the ADEA.

Act, *see, e.g.,* 1991 Civil Rights Act § 115, and, therefore, the decision to limit the scope of § 112 to Title VII is significant. Those sections aside, the only two cases which have addressed the applicability of the Act to a preexisting ADEA claim have refused to do so. *See Guillory–Wuerz v. Brady,* 785 F.Supp. 889 (D.Cal.1992); *Morgan v. Servicemaster Co.,* 57 FEP Cases 1423, 1992 WL 79291 (N.D.Ill. Jan. 22, 1992) (refusing to apply the Act to ADEA claim even though courts frequently look to Title VII interpretations for guidance in ADEA litigation).

■ Even assuming that the Act in whole or in part applies to ADEA cases, it does not apply retroactively. Scores of district courts have addressed the issue of the retroactivity or non-retroactivity of the Act and have come to differing conclusions. *See, e.g., Khandelwal v. Compuadd Corp.,* 780 F.Supp. 1077 (E.D.Va.1992) (non-retroactive); *Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302 (N.D.Cal.1992) (retroactive); *Van Meter v. Barr,* 778 F.Supp. 83 (D.D.C. 1991) (non-retroactive); *King v. Shelby Medical Center,* 779 F.Supp. 157 (N.D.Ala. 1991) (retroactive). Three judges of this Court have refused to apply the Act retroactively, *see Thompson v. Johnson & Johnson Management Information Center,* 783 F.Supp. 893 (D.N.J.1992) (Fisher, J.); *Tyree v. Riley,* 783 F.Supp. 877 (D.N.J. 1992) (Lechner, J.); *Thomas v. Frank,* 791 F.Supp. 470 (D.N.J.1992) (Debevoise, J.) and the only three circuit Courts of Appeal which have addressed this question have likewise refused to apply the Act retroactively. *See Fray v. Omaha World Herald Co.,* 960 F.2d 1370 (8th Cir.1992); *Vogel v. Cincinnati,* 959 F.2d 594 (6th Cir.1992); *Mozee v. American Commercial Marine Service Co.,* 963 F.2d 929 (7th Cir.1992). This court refuses as well.

Although a retroactivity analysis ordinarily begins "with the language of the statute itself," *Bread Political Action Committee v. Federal Election Committee,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982), the language of § 402 is ambiguous at best. That section provides that "[e]xcept as otherwise specifically provided, this Act and the amend-

ments made by this Act shall take effect upon enactment" and further states that "nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975. . . ." Section 402(a), (b). This provision can be read as either implying retroactivity to cases filed after March 1, 1975 or, as the courts have noted, as a means of ensuring "that nothing in the Act will apply retroactively to the Wards Cove Packing Company, an Alaska company that spent 24 years defending against a disparate impact challenge." 137 Cong.Rec. H9,512 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde referring to *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)).

Equally ambiguous are the expressions of intent by individual members of Congress. *Compare* Cong.Rec. H9,530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards) ("The intent of the sponsors is that . . . the bill be applied to pending cases except where the bill expressly provides otherwise.") *with* Cong.Rec. H9,548 (statement of Rep. Hyde) ("The Act and the amendments made by the Act . . . will not apply to cases arising before the effective date of the Act."). Thus, the well settled principle—"where the congressional intent is clear, it governs," *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990)—is of no assistance.

The proper focus, therefore, is on established precedent as to whether to apply a statute retroactively. This, too, is less than clear. In *Kaiser Aluminum, supra,* the Supreme Court pointed out the "apparent tension" that exists between two lines of cases on the issue of retroactivity. The first line of cases establishes that a statute is to be applied retroactively unless this "would result in a manifest injustice to one of the parties or there is clear congressional intent to the contrary." *See Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). A more recent line of cases espouses the rule that because "retroactivity is not favored in the law . . .[,] Congressional

enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). The *Kaiser* court did not deem it necessary to resolve the conflict because of the clear congressional intent dispositive in that case.[17]

■ Here, retroactive application of the Act is improper under either scenario. Thus, retroactive application would not only unjustly affect the right of repose to which defendants are entitled when the statute of limitations has run under existing law, but there is utterly no language in the Act requiring retroactive application. In any event, it is likely that the Supreme Court would be of the view that its later decision in *Georgetown,* which noted that retroactivity is disfavored, is more on the mark than its prior decision in *Bradley.* Moreover, the EEOC, whose view is to be afforded "considerable weight," *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), has taken the position that the 1991 Act should not be applied retroactively, at least with respect to seeking compensatory damages.[18] EEOC Notice, No. 915.002 Dec. 27, 1991.

Because the Act, even if otherwise applicable, is not to be applied retroactively, *Lorance,* if applicable, is controlling.

Plaintiffs contend that even if *Lorance* is good law, that case is limited to seniority systems which are facially neutral. Plaintiffs, again, are wrong.

■ In *EEOC v. City Colleges of Chicago,* 944 F.2d 339 (7th Cir.1991), the Seventh Circuit, invoking *Lorance,* held that an ADEA claim was barred by the statute of limitations because, among other reasons, the same considerations which apply to Title VII seniority system issues control ADEA benefits claims. The *City Colleges* court stated that:

[I]t does not violate the ADEA to make age-based distinctions in paying fringe benefits ... Fringe-benefit plans that make age-based distinctions violate the ADEA only if adopted with a specific intent to discriminate in a non-fringe area of employment. Consequently, as in *Lorance,* because the legality of City Colleges' early retirement plan "is wholly dependent on the alleged illegality of signing the underlying [collective bargaining] agreement, it is the date of that signing which governs the limitations period." *Lorance,* 490 U.S. at 911 [109 S.Ct. at 2268].

Because 623(f)(2) provides that it is not unlawful 'to observe the terms of ... any bona fide employee benefit plan' that is not adopted as a subterfuge, one could argue that an employer violates the ADEA every time it does observe the terms of a plan that is adopted as a

---

**17.** When the Court of Appeals for the Third Circuit had *Kaiser* before it, *see Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 865 F.2d 566 (3d Cir.1989), *aff'd in part and rev'd in part,* 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), it stated that there was no inconsistency between *Bradley* and "the long-standing rule of statutory construction that statutes are presumed to have only prospective effect ... The presumption against retroactivity has generally been applied only when application of the new law would affect rights or obligations existing prior to the change in law." *Id.* at 573. In addition, the Third Circuit in *Davis v. Omitowoju,* 883 F.2d 1155, 1170 (3d Cir.1989) affirmed the district court's refusal to give retroactive application to an amendment to a statute relying upon "the canon that statutes operate prospectively...." However, the Third Circuit has also relied upon *Bradley* to retroactively apply an amendment to the Lanham Act. *See United*

States *Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 922 n. 9 (3d Cir.), *cert. denied, Independence Blue Cross v. United States Healthcare, Inc.,* —— U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990).

**18.** The EEOC's position on a matter involving statutory construction is in no way binding upon the Court, although deference to such construction is appropriate where reasonable. *See Vogel,* 959 F.2d at 598. It is also noteworthy that "the Court of Appeals for the Sixth Circuit's decision in *Vogel* apparently stands for the proposition that because some of the 1991 Act's provisions affect substantive rights, the entire Act should be prospectively applied." *See Mozee,* 963 F.2d at 940 (*citing Vogel,* 959 F.2d at 598). As stated by the Court of Appeals for the Seventh Circuit, "[t]his position is not without merit." *Mozee,* 963 F.2d at 940.

subterfuge. Consequently, each time the employer observes (applies) the plan, a new violation occurs that triggers the limitations period. The problem with this argument is that the Supreme Court could have said the same thing in *Lorance* ... See generally *Lorance*, 490 U.S. at 906–09 [109 S.Ct. at 2265–67]. *Lorance* thus rejects the assertion that a new limitations begins with each application of an employee benefit plan that is illegal because it was adopted with discriminatory intent.

*Id.* at 342.[19]

Clearly, then, at least in the *City Colleges* court's view, *Lorance* is not limited to seniority systems, and this court agrees. Moreover, plaintiffs' contention that a benefits plan that makes age-based distinctions on its face is not governed by *Lorance* is erroneous. In *Public Employees Retirement System v. Betts, supra,* the Supreme Court specifically rejected this contention in holding that a benefits plan that makes age-based distinctions is not unlawful simply because of those distinctions unless it was adopted with the purpose of discriminating in non-fringe benefit areas of employment. *Id.* 492 U.S. at 181, 109 S.Ct. at 2868. And where, as here, any "age-based distinctions" have been part of the predecessor plans to the Republic Plan since at least as early as 1974, plans that are not challenged here, nothing new was "adopted" in 1985 and thereafter as a subterfuge for discrimination.

■ Finally, plaintiffs contend that even if *Lorance* is applicable and it was the discriminatory adoption of the suspension provision and GA–4921 which triggered the limitations period, they did not have "clear notice" until September 1989 that payment of their annuities would not be made at age 60. It is, of course, clear that a limitations period is not triggered unless a plaintiff knew or should have known of the purported violation. *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1418, 1419 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991). It is equally clear that where, as here, retirement benefits are as important a part of plaintiffs' employment as plaintiffs suggest, it is unreasonable to claim, as plaintiffs claim, that they did not know what the amendment to the Republic Plan and GA–4921 provided. *Cf. Knoll v. Phoenix Steel Corp.,* 465 F.2d 1128, 1132 (3d Cir.1972).

In any event, and separate and apart from the fact that the 1985–86 adoption adopted nothing new (and plaintiffs do not allege that they did not know what the earlier plans provided), plaintiffs were notified in January 1987 when they received their annuity certificates that this "annuity may be suspended" and were referred to the terms of the annuity contract and the plan. They could have, but claim they did not, review those documents. Certainly, plaintiff Thompson, at least, who recites examples over the years of the "long history of discriminatory treatment of employees over the age of 60" on the part of Northwest, Republic and ALPA (Thompson Aff., ¶ 3) should have known enough to look further when he received his annuity certificate.

But, that aside, ALPA represented plaintiffs and its other members and was not only a party to the decision to amend and thereafter terminate the Republic Plan and annuitize the accrued benefits thereunder, but was involved in the negotiations which culminated in GA–4921. It was ALPA's obligation to advise its members of the results of the collective bargaining. Failure to do so, if failure there be, could well have been the subject of an action against ALPA. *See, e.g., Warehouse Union Local 860 v. N.L.R.B.,* 652 F.2d 1022, 1025

**19.** Parenthetically, there is no dispute that GA–4921 constitutes an employee benefit plan for purposes of § 4(f)(2). This is not to say, as discussed above, that GA–4921 is an employee benefit plan under ERISA. Had Congress intended to promote uniformity between the ADEA and ERISA in this context it could have expressly done so. *See* 29 U.S.C. § 623(i)(9). Here, section 4(f)(2) does not incorporate ERISA's definition of an employee benefit plan; indeed, an employee benefit plan may be governed by § 4(f)(2) and not by ERISA. *See EEOC v. Chrysler Corp.,* 729 F.Supp. 1002, 1008 (S.D.N.Y.1990), *superseded by statute on other grounds as stated in Dinerstein v. Frank,* 58 EPD (CCH) 41373, 1991 WL 254567 (S.D.N.Y.1991); *see also Gabarczyk v. Board of Education of Poughkeepsie,* 738 F.Supp. 118, 124 (S.D.N.Y. 1990).

**1352**

(D.C.Cir.1981); *N.L.R.B. v. American Postal Workers Union*, 618 F.2d 1249, 1255 (8th Cir.1980).[20] It cannot, however, be invoked to effectively set aside provisions of many years duration on which many thousands of employees have relied.

■ Thus, because plaintiffs' ADEA claim is untimely and because, in any event, it fails as a matter of law, defendants' motion for summary judgment on this count will be granted.[21]

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment will be denied, Northwest's and Prudential's motion for summary judgment will be granted, and all crossclaims will be dismissed. Because counsel for plaintiffs has represented that plaintiffs seek no relief against ALPA, on the court's own motion the complaint as to ALPA will be dismissed.

## ORDER

This matter having come before the court upon the motion of plaintiffs for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56; and on the cross-motions of defendants Prudential Insurance Company of America ("Prudential") and Northwest Airlines, Inc. ("Northwest") for summary judgment, pursuant to Fed.R.Civ.P. 56; and on the court's own motion vis-a-vis defendant Air Line Pilots Association, International ("ALPA"); and the court having heard oral argument and having considered the submissions of the parties; and

For the reasons expressed in this court's Opinion dated June 23rd, 1992;

IT IS on this 23rd day of June, 1992

ORDERED that plaintiffs' motion for partial summary judgment is denied; and it is further

ORDERED that defendant Prudential's cross-motion for summary judgment is granted; and it is further

ORDERED that defendant Northwest's cross-motion for summary judgment is granted; and it is further

ORDERED that on the court's own motion, the complaint as it applies to defendant ALPA is dismissed.

**20.** When a union is representing its bargaining unit members, a duty of fair representation generally governs its conduct. In *Warehouse Union Local 860,* the union did not advise its members that the employer had threatened that if clerical workers persisted in their demand for a wage increase, the clerical unit would be eliminated, information not otherwise available to the membership. The workers persisted and lost their jobs. A breach of the duty of fair representation was found. Similarly, in *Swatts v. United Steelworkers of America,* 808 F.2d 1221 (7th Cir.1986), the court applied the duty of fair representation but found no breach because the information the union failed to provide its members was readily available to the general public. Thus, here, if plaintiffs did not know of the negotiated amendments to the plan and the adoption of GA–4921 with the changes purport-

edly engendered thereby, as they allege, they should have looked to ALPA before, under *Del Costello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the six month limitations period of Sec. 10(b) of the NLRA, 29 U.S.C. § 160(b), expired.

**21.** Even if plaintiffs' ADEA claim was not barred as a matter both of time and of law, it necessarily fails as it applies to Prudential both because plaintiffs have failed to satisfy the exception to the EEOC filing charge requirement established in *Glus v. G.C. Murphy Co.,* 562 F.2d 880 (3d Cir.1977), and because they have failed to establish that Prudential was either their employer or an agent thereof. *See, e.g., EEOC v. Zippo Mfg., Co.,* 713 F.2d 32, 37 (3d Cir.1983).